Mr. Burge, you may proceed. Good morning, your honors. Jason Burge, on behalf of the plaintiffs, a class of former steel workers at Bayou Steel, who were summarily terminated without warning on the morning of Monday, September 30, 2019. Now, I want to cover two things in my argument. I want to explain why the district court's ruling was clearly erroneous. And then I want to talk about what this court should do, why this court should reverse and render on liability, because on a review of the whole record, the only conclusion the court should reach is that Black Diamond specifically directed the termination of the plaintiffs without notice. Now, this is our second time here. The first time we were here, we got a ruling from Judge Wilson, where I think he laid out the legal issues in this case fairly clearly. There's no dispute that these plaintiffs were victims of a Warn Act violation. In Judge Wilson's opinion, the court concluded that the proper test for determining liability of an affiliated entity is the single employer test. And in this case, the most important factor is de facto control, which this court described as the hinge of the case. At the trial court below, the district court recognized the ultimate and only issue before the district court is who specifically directed the closing of Laplace Mill without proper notice. So this is your argument, as it was in the briefs, as it is today, accepts that legal paradigm, and we're looking for whether Carl Barbier committed clear error factually. Correct. This is a clear error review, depending largely on the facts before the court. And the first time we were here, this court recognized that the district court had made a factual error when it ruled that the independent directors had voted to approve the bankruptcy prior to the terminations. And it remanded because there were genuine issues of material fact that needed to be tried. We went down and had that trial. We're back here because the district court made the same factual error. It held that the independent board members, quote, apparently made the ultimate decision to close the plant and immediately begin terminations, which caused the Warnack violations to occur. Now, it made that decision based on a portion of the deposition testimony of one independent board member. And that deposition testimony is contradicted by the remainder of that independent board member's deposition testimony, the testimony of the other two independent directors, the live testimony at trial from the Black Diamond witness who was on the board, and from the documentary evidence in the case. Even if that's all accurate, he could choose to credit the fellow's name, Archambeau. Is that correct?  Well, I think if you look at the clear error standard, the standard is not there is no evidence. The standard in just last year, this court looked at this issue in the appliance liquidation outlet decision. In that decision, there was testimony that the plaintiff company used the phrase, appliance liquidation, as part of their business. And therefore, it should be a trademark. And this court looked at that and said, we see that testimony. But that testimony is undermined by every other fact in the case. And so we could come to the clear, well, the definitive and firm conviction that the district court got it wrong. And similarly, There were only four witnesses, right? Fleming, he didn't know who fired. Correct. OK. Then the second one was COO Davis.  He denied he did. And then we had to specifically testified. And the quote in the record at 3739 is that Black Diamond made the decision to lay off the entire staff at Laplace. He testified that there, also at 3729, and also at 3832. So he both denied he did, and he explicitly said Black Diamond.  And he explicitly denied that he did it. In fact, he said that on that Friday morning, when the HR director came to him and said, we're not going to honor the WARN Act, he then went and tried to contact Black Diamond to get them to change that decision, because he was so offended by it. That testimony is in the record at 3732, as well. But if you look at just Archibald's testimony, if you read his deposition, what he says expressly is that no vote occurred on firing the employees until after the Black Diamond members resigned. The testimony is very clear. There's no dispute. The Black Diamond members didn't resign from the board until the evening of Monday. That was 12 hours after the terminations. We also know there was an issue that came up at trial about how could a board of directors composed of six people, when three of them abstain, how could those three people approve anything? That's not a majority. And what they said was, well, there was a waiver. They got a specific waiver allowing three board members to take action. But the testimony is likely also in the record. That waiver wasn't executed until the middle of the day on Monday, after the terminations. It sounds like you know the record very well. So you're saying the Archambault deposition, he acknowledged it wasn't until after Monday. I thought he was unsure about the timing, but he did say that they had made the decision the plant would shut. He said any vote that was taken by the board on terminations happened after Monday. And in fact, he specifically testified elsewhere at 78, or excuse me, at 6609 to 10, that he didn't even understand that the bankruptcy was gonna require a mass layoff. He said that part of the Chapter 11 process is typically restructuring the business. It wasn't brought to my attention in any way that they'd have to do a mass layoff like that. Kristen Barney is the one who's drafting and eventually not sending either the compliant or the non-compliant Warren notes, right? She is the HR director who is drafting. And she was working for Bayou Steel, not an employee of Black Diamond? Well, it's a little unclear, because what's clear that she is definitely an employee of Bayou Steel. She is the HR director. I think there is no dispute that the HR director. That could corroborate Judge Barbier's decision to credit the statement of Oshombo, that this is still a layoff decision being made by Bayou Steel. Well, she did not testify that anybody at Bayou Steel gave her the instructions to do that. Yeah, but she's the one that we know that was compiling these Warren notices. Well, what we know is that she was drafting one version of the Warren notice on Wednesday, and then by Friday, she's got a new version that no longer complies with the statute. And we know that Friday morning, she had a phone call that she testified about with the Black Diamond employees and with the bankruptcy professionals, and nobody else from Bayou Steel was on that call. So during this critical period, she is communicating directly with Black Diamond, including Black Diamond people who are not even on the board. There's a gentleman named Ritesh Tana that she's communicating with through this period. And I think all of that could support, or does support the idea that there was, that Black Diamond was behind this. But if you look at the live testimony of the Black Diamond witnesses, there was only one board meeting at which this vote to terminate the employees could have happened. It was the Friday meeting. And Sam Ferenac gave testimony at trial. There was no discussion of terminating the employees at that meeting. Phil Rager-Detsky, the other Black Diamond member, he gave testimony in his deposition. There was no discussion of terminating the employees at that meeting. So the only meeting where that vote could have happened, there's testimony from multiple people it didn't happen. The other two independent directors, Taft and Unfried, they both testified. There was never a vote to terminate the employees. So you've got the uncorroborated testimony of a single independent board member that's contradicted by his own testimony and all of the other evidence contradicts it. And if we want- Where, if you recall at the trial at the end, Judge Barbier's having a final exchange with counsel. Correct. And you probably remember that. I do. He asked, I think, your counsel, what was Black Diamond's choice? And Pearson was told they either have to continue funding or send out the notice. Well, I- You don't interpret, the private equity doesn't have to keep funding forever or be in violation. I think if you take a look, and I think this court should take a very close look at the Pearson opinion, which the court quoted affirm, you know, quoted positively in the last opinion. I think if you look at Pearson, what that case says is there is a fine line when you're talking about lending. And there's no specific bright line rule that lenders cannot be liable. A lender can be liable like any other affiliated company if they make the decision. And in the Pearson- But Pearson also talked about how the entity there, if I'm remembering right, was still asking for money, was still doing things independently and had some, they needed money because they were debtors. And so they needed a creditor. So they were obviously ceding power and doing all those things that Bayou still did here. But I mean, they still had, they were their own entity. Correct, and they had- That was true here also, despite the overlapping relationships between the parties. They were their own entity, but if you look at the vitality of that entity in Pearson, it's much different than here, right? I mean, what you see is that CompTech, before they even get into a dispute about lending, is doing their own research about having to close down and about whether they can comply with the Warren Act. They're going out and negotiating, specifically CompTech with GECC, about trying to get this money. And when it becomes apparent they can't, they then approach other lenders and try to achieve other financing. There's none of that happening here. What happens here is that the evidence will show Black Diamond took its sweet time deciding whether or not to do this lending. On the 22nd, so nine days before the terminations, it makes a decision. We don't want to lend any more money. We want to liquidate. And at that point, they just immediately pivot to bankruptcy. There's no other action whatsoever. Well, the Bank of America was calling in its $40 million loan. Well, the Bank of America was calling in its loan, but that's the whole point of bankruptcy protection. If they had gone into bankruptcy protection with the employees, we don't know what would have happened. Just so I understand, you're not saying there's a Warren Act violation if you stop funding an entity? Correct. By itself, simply not funding does not create a Warren Act violation. Okay, so then you recall at the end, Judge Barbier is saying it looks like it's all down to Kristen Barney. And the response was, no witnesses acknowledged who told her not to send the notices, but Black Diamond is the only entity that benefits.  Benefits is not the test. No. Pearson, Fleming won. But it's not that it's a benefit. It's that there's a motive, right? And this is an important part of the evidence here. We've got to show who specifically directed the actions. What evidence was there that Black Diamond specifically directed the action? Well, the evidence is that she was having phone calls specifically with Black Diamond, with James Hogarth and Ritesh Tanna at the time when the Warren Act notices changed. And that if you take everybody else who could have directed the actions. There's smoke. I guess I'm asking, where's the fire? Well, I think at some level, it is true. We do not have a person who came forward and said, I made the decision. Kristen Barney didn't say she made the decision. Nobody at Black Diamond said they made the decision. Nobody at Bayou Steel said they made the decision. But we have excluded all the people who could have made the decision, right? Mike Williams, the CEO, he testified he didn't make the decision. He learned about the mass layoff on the news. Alton Davis, the COO, the second in command who became the head in command once Mike Williams left. Exclude everyone, zero plus zero plus zero. It doesn't mean that you've shown that Black Diamond issued a specific directive to close the plant, terminate the employees. But I think you can make this conclusion based on circumstantial evidence. You could make it, but did he commit clear error, the district judge, when he didn't make that inference? Well, I think the clear error he committed is that the conclusion he reached, that the independent directors did it, that conclusion is wrong. That doesn't mean you win. Well, that conclusion means that there is clear error and that is wrong. Now, for me to win, I have to show that the evidence would support that Black Diamond did it. And I think if you look at our best evidence, we have that, we have the testimony. Aren't you basically asking, you started out saying you wanted us to render. You're asking us to substitute our fact finding for Judge Barbier's. Only because his fact finding is clearly erroneous. I think if you look at that appliance liquidation decision, in that case, the court concluded there's no evidence to support what the district court found and it did not feel the need to remand back down for further fact finding. It said, we can see what the right result is. We're gonna modify the judgment and put that into effect. It did not require going back down and having another trial on liability. I mean, here, we've been here twice in this case. The district court's made the same error both times. I don't think it's necessary to send it back down for another liability. I may be mistaken. I thought the error that was identified by Fleming one was there is an issue of fact. Well, but- And he goes back and he hears four witnesses and he comes to the conclusion he does. Well, there's also a factual error that was admitted by the district court in the first time. It is in the footnote at the beginning of Fleming one, which is the district court held in its original ruling on summary judgment that the independent board members placed into bankruptcy before the terminations. That was a factual error. We go back down to have the trial and he rules, well, the independent board members voted to terminate the people. Again, there's simply no evidence they did that before the terminations. That's the clear error in this case that's just right on the face of the opinion. He rules that it was the independent board members when it plainly was not. Clearly was not- Not that you agree with it, but you can probably quote verbatim the Archambault statement that is relied on. Correct, he says- What did Archambault exactly say? I believe what he exactly said was that the Candlewood, I believe Candlewood and Pulcinelli, who were the bankruptcy professionals, made a recommendation to the board and the board voted to accept that recommendation. That was what he said. And then when he was asked further about it, he said, that would have happened after the Black Diamond people resigned. We asked him specifically, so that means it would have been after 11.59 p.m. on Monday evening? He said, yes, it would have been after that. And so that's 15 hours after these terminations happened. And he said specifically when we asked him, did you know there were going to be mass layoffs when you voted for bankruptcy? He said, no, I thought this could be a restructuring. I didn't see any reason why there would have to be a mass layoff. That's in the record as well. And so for all those reasons, there is clear error here. And I think there are more than enough facts, any circumstantial case can be described at some level as what you have is a lot of smoke, but no fire. But what we have here is, as this court recognized the first time, somebody had to make this decision. And we have excluded all the decision makers at Bayou Steel who could have made this decision. All we have is the Black Diamond employees who it's undisputed were all over this place during the week leading up to the bankruptcy. This is not a GECC situation like a Pearson where the lender says no and then disappears. There's no question there was a finding in the prior opinion and it's all over this case that they were micromanaging this plant. They were actively involved in its management. Mr. Davis testified no significant decision over three years ever happened without their intimate involvement. The idea that this decision wouldn't have happened without their intimate involvement, it's just inconsistent with the case. And when you exclude all the Bayou Steel decision makers, that suggests Black Diamond did it. Now, a final thought on the remedy here. I think you can reverse and render on liability. You obviously don't have to. You could reverse and send back down for further factual findings. I do think you have to send it back down for damages because if you look at the text of the Warren Act, the district court has discretion to decide whether to reduce the damages based on good faith. And obviously we never got there. There is a stipulation in the record on damages, although it leaves about a $250,000 delta for the district court to resolve. So I think we would have to go back down to deal with damages. But I think because there is clear error, you could reverse and render on liability and simply send it back down for resolution of damages. Thank you, counsel. I'll reserve the remainder of my time for rebuttal. Thank you. May it please the court. Jeff Sager for Appellee. Your Honor, as you recognize, the last appeal of this case remanded a very narrow factual issue for trial, whether Black Diamond specifically ordered the closure of the LaPlace facility. Plaintiffs, of course, had the burden of proof there. The trial court found that they did not carry their burden. And unless they did not carry their burden,   unless there's clear evidence or clear error here, this court cannot disturb that finding. Just on that, I'm just wondering, because we issued that in September of 23, right, that decision. And we largely, am I right, we embraced largely the Third Circuit's Pearson decision deferring to the DOL interpretation of the WARN Act? Correct. That ruling held that four of the five DOL factors were already decided in Black Diamond's favor. My question is, we have Loper-Bright now. Excuse me? We have Loper-Bright now. So why wouldn't we be revisiting the rule? We wouldn't necessarily defer to the Department of Labor and come up with this de facto test. Well, if I understand your question correctly, Judge Higginson, you're asking whether we even need to look at the other four factors or whether it's the specific rule? Is that? I'm wondering, oh, I guess here's the question. Has any circuit revisited all the deference that's been given to the Department of Labor interpreting what a single employer is since Loper-Bright in the context of the WARN Act? No, Your Honor. You have this court's decision in the MNESSAF, which I believe they want to use Pearson as their best case. Pearson went against it. All those predate Loper-Bright? All those predate, correct. And we have a fact finding that I doubt you dispute here by the district court, that your client aggressively micromanaged down into the weeds. If you didn't have a rule, a Department of Labor interpretation of the statute, that in other contexts would be sufficient. That would be under an economic reality test, you would be the employer. Pearson looked at other tests. There are certainly other tests that could apply here. Pearson adopted, just yes or no, they adopted the Department of Labor's interpretation. Absolutely. OK, and Loper-Bright says we don't defer to them anymore. The court's decision in the MNESSAF stands. So in the Fifth Circuit, we're still addressing this. MNESSAF wasn't post-Loper-Bright, was it? Well, I'm not aware of a Fifth Circuit decision. Has any court yet said, you know what, we're going to stop deferring to executive agencies? I'm not aware of any decision that's been made. And that's not what they're arguing. He's just stood up and said, this is all about CLEAR. That's the law of the case. Correct. And specifically with respect to whether Black Diamond ordered the closure of this plan. And Mr. Burge, my friend, said he already made this mistake once, and he made it again. It was a markedly different context. You sent it back for a trial. The district court heard from four live witnesses, as you mentioned, nine witnesses by designation, each testifying about what they saw and did in the days leading up to the plan's closure. Among them was Sam Ferenac, a Black Diamond managing director. He was also a member of the board of directors of Bayou Steel at the time. He testified directly at trial that Black Diamond did not direct the closure of the plan. It's in the record at 3842 to 3843. Black Diamond's founder and managing principal, Steve Deckhoff, testified at trial that neither he nor anyone else at Black Diamond ordered the plan's closure. That's record 3961, lines 6 to 10. Is he right when he quoted Davis as saying Black Diamond did order the layoff? Absolutely. Mr. Davis, it was clear. If you look at the cross-examination, he was speculating. His point was, I think that Black Diamond is so involved that they could have been the only one. He did not have any actual facts. He was not in the meetings. This case began with an allegation that it is a case of warring witness testimony. Absolutely. But critically, what plaintiffs are not doing here is they're not discounting the direct testimony from all the Black Diamond people saying, we did not close this plan. Mr. Hogarth said that. Mr. Ray Gerdetsky said that. And the trial court, of course, is free to weigh the evidence. And they concluded that plaintiffs didn't meet their burden of proving that Black Diamond specifically directed the closure. So there was no clear error. There's no basis to overturn it. Appliance liquidation did not change the clear error standard. What about his comment that Archambault's statement was absolutely only as to a decision made after Monday? Well, I think that is, Mr. Burge stated that that was clear and definitive testimony. It was far from clear and definitive. The testimony, if you look at record 6592, lines 22 to 6593, to your question, Judge Higginson, he said, from what I recall, this is Archambault, it was a recommendation determined from Candlewood and the board approved the recommendation. And that's because there was no more cash coming into the business. There was no way to fund payroll. And Bank of America was looking to liquidate. Let's remember, on Friday, September 27, Bank of America accelerated the loans to the tune of $41.2  There was no disagreement that there was no money to pay these employees when they came in on September 30. And again, on Archambault's testimony, record 6605, lines 10 to 17, who first told you the need for the mass layoff? My recollection was Candlewood, is his answer. OK, do you recall when that occurred? I don't. They then have a colloquy back and forth in the deposition about, do you think it was before the Black Diamond individuals resigned from the board? He said, no, I think it was after he was shown an email that that resignation was September 30 in the evening. He said, oh, so it must have been after, which is what they're relying on. Again, pinpointing the exact date of when that meeting was, the judge, the trial court, is free to weigh the evidence. And he points that out at page 7, that Mr. Archambault was not able to pinpoint the exact date, but yet he found that there was some merit in his testimony. And I'd submit that recalling that an event occurred is more reliable than two years after the fact in the deposition remembering the exact date. There's nothing in the record that there was any meeting September 30 or afterwards. Everyone agreed there was a meeting on September 27. Now, recollections. Just so I understand, the rule that Judge Barbier was asked to apply is there's got to be, to have upstream liability, even if the private equity is controlling almost everything, all the capital, aggressively micromanaging down to the weeds. Still, they're only on the hook if they specifically direct that, what, there be a shutdown without notices? From the WARN Act itself, statutory language, that the employer, so if there is a single employer finding, specifically orders the plant closure or mass termination. Implicitly without the notice. Right. But why wasn't Barbier right, and maybe you agree, at the end to be saying, well, we're going to answer this by looking at the HR manager. That was Ms. Barney. That was Ms. Barney. And then their point is, well, she ultimately spoke to one group of people. It was Hogarth and Tana. That is not accurate. I mean, it's accurate that they said that, Judge Higginson, but it's not an accurate representation of the record. First, I just want to start with the fact that Ms. Barney didn't say that Black Diamond directed anything in the course of the WARN notices. There's no evidence that Black Diamond directed her. So they're pointing out that phone conversation, but that's not in the testimony. You can scour the whole testimony. It's not there. As to who was responsible, the trial court, I think, hit the nail on the head on this issue when it was asking in the post-trial argument, quote, did you ask Ms. Barney during the deposition the precise question, why didn't you send out the letter with the 60 days notice? Did someone tell you not to send the notice out? Mr. Burge's response was, I don't know that she was asked that question. That would have been my first question, is what the court said, record 3969 to 70. Ms. Barney wasn't asked the question. Plaintiffs elected not to call her for this trial, even though she was in subpoena range. They can't now rely on inferences. They're asking this court to connect dots where the trial court chose not to. They can't do that to meet their burden of proving Black Diamond directed any changes to the WARN notice. And I'll just point out briefly, on Ms. Barney's testimony, they say that there was an original draft, I believe on September 25th, that it included 60 days notice. That's not accurate. If you look at the record on 5232, there's a blank for those spots. And on the evening of September 26th, Ms. Barney, without anyone from Black Diamond on the chain, is communicating with Pulsinelli, who's bankruptcy counsel, a gentleman named Bill Robbins. And Mr. Robbins refers to a change in the draft, including the exceptions for the WARN notice, the unforeseeable business circumstances. So that was 926, that's before anything with this call, which, by the way, all that was talked about by Ms. Barney in her deposition was that they decided it was going to be sent out on the 30th rather than the 27th. It was just about timing. Makes sense because there wasn't a board meeting until the afternoon of the 27th. Would it be fair to opposing counsel that they're not interpreting so the private equity holders have got a fund forever? They're just saying, if you're gonna run the show, call all the shots, you've got a fund for the 60 days. Is that what they're saying? I'm hearing different things. Because, first of all, the notion, and I think I just heard him, Mr. Burge, accept this, the notion that you didn't fund cannot be enough standing alone to have liability. And that was decided by the trial court early in this case, was never challenged on appeal. It's law of the case, that's record 5144. And they conceded during post-trial argument, quote, there's no legal obligation for black dive men to fund. So now I hear them, they're talking about Pearson as if somehow it supports their position. Summary judgment was granted in that case. The court might have said it was a line drawing exercise to look at that, but they didn't cross the line. And they can't cite to any case and have never been able to cite to any case where the court found that lack of funding was enough in this case. So Pearson doesn't help them. It's on all fours with the Warnak language itself. It's on all fours with the ruling in admittance staff, and admittance staff cites the Pearson favorably in that. So plaintiffs do not and cannot cite any case. If Pearson's their best case, it just does not carry the day. I think lastly, your honors, I'd just like to cover this point on reversal and rendering. It's not a possible solution here. In Fleming one, this court held, as you know, that four of the five Department of Labor factors were in Black Diamond's favor. This court held that if the district court had found de facto control, which it didn't, then the next task would be to determine, quote, whether liability is warranted even in the absence of the other four DOL factors. Respectfully, your honors, there's no point to send this back to the trial court who already found that there's no de facto control here. The district court held the trial that was ordered in Fleming one. It heard from witnesses. It made credibility determinations. It didn't say, you know, it heard those Black Diamond witnesses, and it had to have gone into the mix in making his final decision. It reviewed the lengthy briefing that was submitted and post-trial arguments, and in the end, plaintiffs could not meet their burden of proof. They cannot meet their burden of proof. They've conceded there's no direct evidence. They say it was Black Diamond. It must have been Black Diamond, but can't answer who, what, where, when, or how. That's not clear error. There's no clear error, and the trial court's decision should be affirmed. With that, I'm happy to answer any other questions the panel may have. Thank you, counsel. Thank you. Rebuttal. Thank you, Your Honors. So, in terms of the trial court's specific finding as to the testimony of Archambault, I think there is more than enough evidence from the other depositions. There are four, you know, what was not mentioned by Mosin counsel when he was saying that there must have been a vote at this meeting was that his own witness testified at the trial that there was no discussion, there was no vote at that meeting. That was the same testimony given by Rager and Detsky. That was the same testimony given by Taft and by Unfried. And so, the single testimony of a single person, which is equivocal, the district court recognizes he doesn't have any memory of the timing, and he specifically testifies that he doesn't believe that at the time he made his vote on the bankruptcy, he would have been terminated of the employees. I'd submit that evidence by itself, that sole statement is not enough to affirm this holding that he made the decision. The two Black Diamond witnesses both said they didn't make the decision. Correct, but that's equivalent of, you know, a criminal defendant denying liability. Of course they said that, if they had said they did make the decision. At the end of the day, you had a trial. Correct. One day, two days? One day. One day trial. Yes. Judge heard all the witnesses. He did hear all the witnesses. The argument you're making right now, you made before that court. Correct. And does fact find that the judge had the right to weigh facts, determine the credibility of witnesses, and make a decision based on that testimony and the other evidence? He did, although to be fair, he did not make a decision based on any of the live testimony. His decision was based only on this deposition submitted separately. All the live testimony did not support his conclusion. All right, you're not suggesting he ignored the live testimony. No, I'm not. I'm just saying he apparently rejected all the live testimony and relied on a straight comment and a single deposition. Well, I thought we just said the two Black and Decker witnesses did deny that they made the decision. They denied that they made the decision, but they did not say that the independent directors made the decision. But you don't win on that. You don't win by just disproving the independent directors. It's got to be their specific directive. And if two witnesses says it wasn't and the judge ruled that way, that's... Well, but I think the point is he came to a conclusion that was clearly erroneous. And so given that, I think this court could take a look at the entire record and conclude that everybody involved denies that they made this decision. But the party that had the motive and the opportunity to do it was Black Diamond. And on a standard where you are in the predominance or preponderance of the evidence, it's 50 plus one. And you are thinking about what is the most likely outcome. The party that had the motive and opportunity to do it, I think there is sufficient evidence that this court could say that's who did it. And what we know is that the specific finding made by the district court is wrong. Do you have any thoughts about my legal question? I know you've presented this as a clear error, but is there any court since Loper Bright that is still deferred to the Department of Labor factor? I don't believe there is, no. And I think that this could be reconsidered in light of Loper Bright. And although given that we already have a decision from this court. You didn't ask us to. And I certainly did not ask you to. I will say that even if you look at Pearson, which we did cite in our brief, it's very clear that the argument that's being made by the defendants here, that typical lender behavior is what, as long as they're in the realm of typical lender behavior, they cannot be liable. The Pearson court twice rejects that argument. They say it doesn't matter what typical lenders do. What matters is who controls this decision. And I think it was critical in Pearson that there was not a level of control. The evidence was that the person that GECC sent down there did not control day-to-day operations, did not have the level of micromanaging you see here. And so I think under Pearson, if you just apply the analysis Pearson does, I think here you have enough evidence to find that Black Diamond did exercise de facto control, even under the Department of Labor standards. And I think that the specific finding by the district court is clearly erroneous. And for all those reasons, we recommend that this court reverse and render liability. Thank you, counsel. Thank you very much. We'll take this matter under advisement.